UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

HELLENIC PETROLEUM, LLC,                         Case No. 21-12317-EPK

     Alleged Debtor.                                  Chapter 7 (Involuntary)

_____/

## RESPONSE IN OPPOSITION TO EMERGENCY MOTION FOR APPOINTMENT OF AN INTERIM TRUSTEE PURSUANT TO 11 U.S.C. § 303(g)

Alleged Debtor, Hellenic Petroleum, LLC ("Hellenic"), responds in opposition to the *Emergency Motion for Appointment of an Interim Trustee Pursuant to 11 U.S.C. § 303(g)* (the "Motion") [ECF No. 7] filed by Petitioning Creditor, Pro Petroleum, LLC ("Pro Petroleum"). In support of its response Hellenic states:

### INTRODUCTION

An involuntary bankruptcy petition is an extreme remedy with serious consequences to the alleged debtor.[1] The appointment of an interim trustee under 11 U.S.C. § 303(g), prior to the entry of an order for relief, is an even more extreme remedy. Through it, creditors can forcibly divest a company of its management and assets in a manner of days. It is an exceptional tool to be employed in extremely limited circumstances. Cases analyzing § 303(g) appointments are indeed limited, "no doubt because the request for such relief is rare."[2]

Ignoring these realities, Pro Petroleum requests an interim trustee on two equally meritless theories. First, Pro Petroleum seeks the appointment due to allegations such as "Hellenic is not

---

[1]    *In re Diamondhead Casino Corp.*, 540 B.R. 499, 505 (Bankr. D. Del. 2015) (footnote and quotation omitted).

[2]    *Diamondhead Casino*, 540 B.R. at 505.

{2387/000/00519459}

paying its debts and obligations as they come due," and "Hellenic is not meeting its contractual obligations to vendors and customers."[3]  These mundane observations, which could be applied to almost every debtor in bankruptcy, were largely precipitated by the bankruptcy filing itself and do not approach the high standard required for § 303(g) relief.  Second, Pro Petroleum speculates that Hellenic is engaged in a "bust-out" and is running up debts, which it has no intention of paying, for the benefit of a successor entity.  As set forth *infra*, that allegation is devoid of factual underpinnings and is frivolous.

For these reasons, as well as the likelihood that the petition against Hellenic will be dismissed, the Court should deny the Motion.

## FACTUAL BACKGROUND

### A.    Hellenic.

1.    Hellenic is a Florida limited liability company formed in 2016.  The company is engaged in the fuel industry.  Its business practices include: (a) buying and selling fuel, whether diesel, renewable or biodiesel marine, (b) storing and transporting fuel, and (c) delivering fuel to truck stops and gas stations.  Hellenic owns a California facility of three acres at which trucks and fuel are stored.

2.    Hellenic generates revenues via cash on delivery.  Revenues received by Hellenic are used to pay operational expenses and to reduce payables.  Recent expenses related to the COVID-19 pandemic, together with substantial fluctuations in fuel prices, have caused the company to run a negative cash flow.

---

[3]      *See* Mot. 17.
{2387/000/00519459}

3.      The principal of Hellenic is an individual named Panagiotis "Pete" Kechagias ("Mr. Kechagias").

**B.      Pro Petroleum is a Competitor Who Improperly Filed an Involuntary Petition to Put Hellenic Out of Business.**

4.      Pro Petroleum is a Delaware limited liability company that conducts business in Florida.

5.      Upon information and belief, third-party, Pilot Travel Centers, LLC d/b/a Pilot Flying J ("Pilot"), is the majority owner of and controls Pro Petroleum.  An article from the publication *Transport Topics*, which references Pilot's majority interest in Pro Petroleum, is attached as **EXHIBIT "A"**.[4]

6.      Pilot operates a chain of truck stops in the United States and Canada, and is the largest purveyor of over-the-road diesel fuel in the United States.  Hellenic and Pilot are competitors in that each entity sells diesel fuel to truck stops.

7.      On or about October 20, 2020 Hellenic entered into an agreement with Pro Petroleum to purchase diesel fuel on credit.  At that time, Hellenic was unaware that Pilot was the majority owner of Pro Petroleum.

8.      Hellenic initially made purchases without incident and ordinary course payments to Pro Petroleum under the credit agreement.  At all relevant times, Pro Petroleum encouraged Hellenic to run up its credit and purchase fuel.  Indeed, Pro Petroleum continued to sell fuel to Hellenic even after ordinary course payments ceased and defaults existed under the credit agreement.

---

[4]      The article is also available on the internet at https://www.ttnews.com/articles/pilot-flying-j-changes-name-expands-energy-market.

{2387/000/00519459}

9.      Upon information and belief, Pro Petroleum acted in this manner for two reasons. First, Cynthia Maurycy, Pro Petroleum's account manager for Hellenic, wished to sell more product in order to inflate her sales numbers.  Hellenic indeed believes that Ms. Maurycy may have delayed submitting invoices to Pro Petroleum's credit department in order to maximize sales in the short term.  Second, it is a common practice in the oil and gas industry for a supplier to create a dependent customer by selling products in excess of the customer's repayment ability.  If the customer does substantial business such that it might compete with the supplier or its affiliates, the supplier can then cut off sales and force the customer to shut down.  That is exactly what happened here—Pilot, via Pro Petroleum, used its leverage as a supplier to indebt Hellenic and then push it into bankruptcy.

### C.      The Bankruptcy Filing and Frivolous Allegations of a "Bust-Out."

10.     On March 10, 2021 Pro Petroleum filed an involuntary petition for relief under chapter 7 of the Bankruptcy Code against Hellenic.  ECF No. 1.

11.     The deadline to respond to the petition is April 1, 2021, and the Court has not entered an order for relief.

12.     Pro Petroleum filed the Motion on March 19, 2021, through which it seeks the appointment of an interim trustee under 11 U.S.C. § 303(g).  ECF No. 7.

13.     Perhaps recognizing the extraordinary nature of the relief it seeks, Pro Petroleum accuses Hellenic of engaging in sweeping misconduct, including making a "calculated run" on fuel in furtherance of a "bust-out," and comingling assets with affiliates.  *See* Mot. ¶¶ 19–47.

14.      However, these allegations are based on vanishingly small amounts of actual evidence.  For example, the bust-out theory alleged by Pro Petroleum is based on the following factual allegations:

{2387/000/00519459}

- By March 2, 2021, Hellenic had incurred some $2.3 million in debt owing to Pro Petroleum and defaulted under the credit agreement. Mot. ¶¶ 20–25.

- On March 8, 2021 Hellenic fired its employees. *Id.* at ¶ 27.

- Mr. Kechagias has been replaced by a husband and wife, Salvador Estrada ("Mr. Estrada") and Olga Estrada ("Mrs. Estrada"), as the management of Hellenic. *Id.* at ¶ 28.

- The manager and registered agent for a third-party entity, Central Coast Petroleum, LLC ("Central Coast") is Mrs. Estrada. *Id.* at ¶¶ 30–34.

- "Upon information and belief," Hellenic purchased two trailers, with one trailer paid for by Central Coast. *Id.* at ¶ 34.

- Mr. Kechagias stated he was in discussions with a creditor of Hellenic, Diesel Direct, to purchase Hellenic. *Id.* at ¶ 36.

- On March 10, 2021 Hellenic entered into a settlement with a separate creditor, Mansfield Energy Corp., to maintain access to its fuel supply. *Id.* at ¶ 37.

15.    Each of these allegations is either false, innocuous or in fact contradicts the bust-out theory posited by Pro Petroleum. In particular:

- While Hellenic has purchased substantial amounts of fuel from Pro Petroleum on credit, this was done in response to increased marketplace demand. As stated *supra*, this was also done with the active encouragement of Pro Petroleum. Allegations of stockpiling are meritless.

- Hellenic has not fired all of its employees. The company retains seven employees in California (five drivers and two administrative workers) and six in Florida. All payroll is processed in Florida.

- Mr. and Mrs. Estrada have not replaced Mr. Kechagias as the management of Hellenic. Mr. Kechagias is the sole owner and manager of the company. Rather, Mr. and Mrs. Estrada are each employees of Hellenic. Mr. Estrada attends to supplier purchasing and relationships while Mrs. Estrada focuses on logistics, scheduling and driver coordination.

- Central Coast is an entity formed by the Estradas to purchase trailers and lease them to Hellenic. This is not unusual, as Hellenic often leases transport equipment to maintain fuel deliveries. Mr. Kechagias has no ownership interest in, control over or affiliation with Central Coast. The

allegation that Hellenic is incurring debt and being hollowed out for the benefit of Central Coast is meritless.

- Mr. Kechagias has discussed a potential sale of Hellenic to Diesel Direct. However, this fact weakens, rather than strengthens, other allegations made by Pro Petroleum. For example, if the Estradas replaced Mr. Kechagias as the managers of Hellenic, as Pro Petroleum contends, why is Mr. Kechagias the individual negotiating with Diesel Direct? Moreover, if Hellenic is being stripped of its assets for the benefit of Central Coast, how could it be a candidate for sale to a third party? The Motion is silent as to these obvious follow-up questions and contradictions.

- Similarly, Hellenic is attempting to maintain access to fuel supply through, *inter alia*, discussions with Mansfield Energy Corp. Again, however, this fact undermines the case Pro Petroleum is attempting to construct. If Hellenic is not operating, as Pro Petroleum claims, why is it actively attempting to maintain access to its fuel supply? And why would it do so if its business is being transferred to Central Coast? Again, the Motion does not even attempt to reconcile these contradictory allegations.

16.    An additional theory forwarded by Pro Petroleum, that of asset comingling by affiliates, is based on even less evidence than that of the bust-out. In the Motion, Pro Petroleum list a number of entities with respect to which Mr. Kechagias is a registered agent or officer. Mot. ¶ 45. Based on nothing more than the fact that "[s]everal of these entities currently have or have had the same principal business address as Hellenic," Pro Petroleum muses, "It is unclear whether any of these entities have respected corporate formalities…Certainly, a trustee would be best suited to quickly investigate these entities, and, more importantly, Central Coast Petroleum, and their relationship to Hellenic…" *Id.* at ¶¶ 46–47.

17.    The comingling allegation is unfounded and meritless. Mr. Kechagias, like any number of Florida entrepreneurs, utilizes common addresses for entities he owns or controls. There is nothing remotely inappropriate in doing so. The reliance of Pro Petroleum on that fact, in requesting the extreme remedy of an interim trustee appointment, smacks of a rushed, faulty investigation and bankruptcy filing.

{2387/000/00519459}

**D.    Damages to Hellenic.**

18.    Although a response to the involuntary petition itself is not yet due, it is imperative to note the significant damages sustained by Hellenic as a result of this bankruptcy filing.  Due to the filing, no suppliers are prepared to do business with Hellenic.  The suppliers and their credit lines are the lifeblood of Hellenic—without the ability to purchase fuel, Hellenic has no fuel to sell.  If the supplier dynamic is not rectified in the near future, it will prove fatal to the company.  The Hellenic Petroleum name, which is trademarked in the United States and Dubai, is now synonymous with bankruptcy.  A potential purchase of an Ohio refinery has evaporated, as the investors participating in the project have left.

19.    These damages were not inevitable.  They were the result of a deliberate choice by Pro Petroleum to shoot the proverbial gun first and ask questions later.

20.    Other suppliers have not taken the drastic step of filing or joining an involuntary petition.  Hellenic notes, for example, that it owes Direct Diesel in excess of $10 million for fuel purchases.  However, Direct Diesel did not file a bankruptcy petition and, upon information and belief, declined to join the instant petition after an invitation from Pro Petroleum.  The reason for this discrepancy arises from the motivations stated *supra*—Pro Petroleum is not acting as a good faith creditor seeking mere repayment of its debt.  This bankruptcy was precipitated by a desire to shut down Hellenic as a competitor.

21.    Hellenic is confident that the petition will ultimately be dismissed, and intends to seek damages under 11 U.S.C. § 303(i).

## <u>ARGUMENT</u>

Section 303 of the Bankruptcy Code permits one or more petitioning creditors to commence an involuntary case against an alleged debtor.  11 U.S.C. § 303(b).  An "involuntary

{2387/000/00519459}

petition is an extreme remedy with serious consequences to the alleged debtor, such as loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment." *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015) (citation omitted).  Given these serious consequences, "courts should be wary of creditors who may find alluring the 'retributive quality' of thrusting a debtor into bankruptcy," and "should not lightly enter an order for relief." *Forever Green*, 804 F.3d at 328 (footnote omitted); *Diamondhead Casino*, 540 B.R. at 505.

Generally, the Bankruptcy Code permits an alleged debtor to acquire or dispose of property until an order for relief is entered.  *See* 11 U.S.C. § 303(f).  In addition to taking the aggressive step of filing an involuntary petition, however, creditors may seek "[a]n even more extreme remedy"—the appointment of an interim trustee under § 303(g).  *Diamondhead Casino*, 540 B.R. at 505.

"There is limited case law applying section 303(g), no doubt because the request for such relief is rare." *Id.*  By its terms, however, § 303(g) conditions the appointment of a trustee for situations where it is "necessary to preserve the property of the estate or to prevent loss to the estate…" 11 U.S.C. § 303(g).  Given this language, "[t]he case law that does exist counsels that a request for an interim trustee <u>should be denied in the absence of an exceptionally strong need for doing so</u> or where no facts are alleged showing a <u>necessity</u> for the appointment." *Diamondhead Casino*, 540 B.R. at 505 (footnotes and quotations omitted) (emphases supplied).  "In order to appoint a trustee, a movant must show a substantial risk of loss to the estate." *Diamondhead Casino*, 540 B.R. at 505 (footnote omitted).   "Further, in order to avoid the appointment of an interim trustee in an involuntary case that may be dismissed, the court must determine, as a

preliminary matter, that there is a reasonable likelihood that an order for relief will be entered."
*Id.*

In this case the Court should deny the Motion because (1) there is not a reasonable likelihood that an order for relief will be entered, and (2) there is not a substantial risk of loss to the estate.

**A.    There is Not a Reasonable Likelihood That an Order for Relief Will be Entered.**

**1.    The petition has not been joined by the requisite number of creditors.**

Section 303(b) sets forth two main scenarios for filing an involuntary petition.  In cases where an alleged debtor possesses twelve or more creditors, excluding employees, insiders, and recipients of voidable transfers, three or more creditors must file the petition.  By contrast, if the alleged debtor possesses fewer than twelve such creditors, only one or more creditors need file the petition.  *Compare* 11 U.S.C. § 303(b)(1) *with* (b)(2).

As a threshold matter, an order for relief will not be entered because an insufficient number of creditors have filed the petition against Hellenic.  Although Hellenic is still in the process of identifying all of its outstanding payables, it has provided Pro Petroleum with the preliminary chart attached hereto as **EXHIBIT "B"**.  The chart identifies more than <u>thirty</u> creditors who hold claims against Hellenic.  Given this, the petition filed against Hellenic must comply with § 303(b)(1) and be joined by three or more creditors whose claims are not subject to a bona fide dispute.  *See* 11 U.S.C. § 303(b)(1).  To date, however, <u>no</u> creditors other than Pro Petroleum have joined the petition.  Nor, in light of the distinct possibility of § 303(i) sanctions being imposed in this case, Hellenic does anticipate that other creditors will do so.

{2387/000/00519459}

Absent the requisite number of petitioning creditors, there is not a reasonable possibility that an order for relief will be entered in this case.  The Court can and should deny the Motion for this reason alone.

### 2.    The petition was filed in bad faith.

In addition to not complying with the plain language of § 303(b), there is a strong likelihood that the Court will dismiss the petition as being filed in bad faith.

Although § 303 does not explicitly refer to good faith filings, involuntary petitions "must be made in good faith."  *In re Manhattan Indus., Inc.*, 224 B.R. 195, 201 (Bankr. M.D. Fla. 1997) (citation omitted).  There are five accepted tests for determining whether an involuntary petition was filed in bad faith: (a) the subjective test, (b) the improper purpose test, (c) the objective test, (d) the improper use test, and (e) the combined test.  *In re Ballato*, 252 B.R. 553, 558 (Bankr. M.D. Fla. 2000) (citing *In re Apache Trading Group, Inc.*, 229 B.R. 891 (Bankr. S.D. Fla. 1999); *In re Landmark Distrib., Inc.*, 189 B.R. 290, 309 (Bankr. D. N.J. 1995)).

Under the improper use test, bad faith is found when a petitioning creditor files an involuntary petition to obtain a disproportionate benefit for itself, rather than to protect against other creditors gaining disproportionate advantages.  *Id.* (quotation omitted).  The improper purpose test finds bad faith based upon the petitioner's improper motivation for filing the petition, such as ill will, malice, or harassment.  *Id.* (citations omitted).  The objective test questions whether a reasonable person would have filed the involuntary petition under the same circumstances.  *Id.* The subjective test "looks to the subjective motivation of the petitioning creditor for the filing."  *Id.*  Finally, the combined test evaluates "bad faith by the subjective and objective standards

contained in Rule 9011 of the Federal Rules of Bankruptcy Procedure." *In re Apache Trading*, 229 B.R. at 893 (quoting *In re Reveley, et al.*, 148 B.R. 398, 407 (Bankr. S.D. N.Y. 1992)).

As stated *supra*, the true motivation of Pro Petroleum in filing the petition has been to place a competitor out of business.  The filing has certainly not improved creditors' prospects for repayment—Hellenic has been cut off from its fuel suppliers, its trademarked name has been damaged and future business opportunities have been lost.  Other creditors in communication with Hellenic are aghast at the deterioration in their repayment prospects and have refused to join the petition after solicitations from Pro Petroleum.  These creditors, unlike Pro Petroleum, recognize that their best chance at a recovery lies in Hellenic restoring access to its suppliers and resuming its prepetition business.

The lack of rational motivation in filing the petition, coupled with Hellenic's competition with Pilot, support a finding of bad faith under the tests referenced *supra*.  The bad faith nature of the petition precludes determining that an order for relief will likely be entered, and the Court should deny the Motion.

**B.      There is Not a Substantial Risk of Loss to the Estate.**

Even assuming *arguendo* the Pro Petroleum acted in good faith and filed a petition that complied with § 303—which is not the case—the Court should deny the Motion because Pro Petroleum has failed to demonstrate a substantial risk of loss to the estate.

Pro Petroleum lists its reasons for appointing a trustee in a series of thirteen bullet points in the Motion.  *See* Mot. 17–18 (allegations supporting a trustee).

Broadly speaking, the bullet points can be divided into two, equally unpersuasive categories.  In the first category, Pro Petroleum recites general, unremarkable allegations about Hellenic being in financial distress.  In addition to being precipitated by the bankruptcy filing itself,

{2387/000/00519459}

however, these allegations could be applied to almost any debtor in any bankruptcy case in the country.  They do not even approach the showing of an "exceptionally strong need" for a trustee that is required under § 303(g).  *See Diamondhead Casino*, 540 B.R. at 505 (footnotes and quotations omitted) (emphases supplied).  Those bullet points, with Hellenic's responses, are as follows:

- "Hellenic is no longer operating a business in the ordinary course, as admitted by Kechagias."

  **Response:**  The Debtor is attempting to operate its business and maintains employees; however, its access to suppliers has been imperiled by the bankruptcy filing itself.  An interim trustee would add administrative expenses to the case without resolving this issue.

- "Hellenic likely has no source of income with which to operate its business, as admitted by Kechagias."

  **Response:**  Again, Hellenic's access to suppliers and income has been imperiled by the bankruptcy filing itself.  An interim trustee would add administrative expenses to the case without resolving this issue.

- "Hellenic is not paying its debts and obligations as they came due."

  **Response:**  In general Hellenic was paying its debts and obligations as they became due prepetition.  Its ability to do so has been threatened by the bankruptcy filing.  An interim trustee would add administrative expenses to the case without resolving this issue.

- "Hellenic is not meeting its contractual obligations to its vendors and customers."

  **Response:**  In general Hellenic was meeting its obligations prepetition.  Its ability to do so has been threatened by the bankruptcy filing.  An interim trustee would add administrative expenses to the case without resolving this issue.

- "Hellenic is not communicating with or providing meaningful information to, nor addressing the concerns of its creditors (but is instead referring them to its attorney), evidencing an intent to hinder, delay or defraud them."

> **Response:** This allegation is frivolous. Pro Petroleum placed Hellenic into an involuntary bankruptcy. The parties are litigating and each is represented by counsel. Referring creditors and adverse parties to counsel does not evidence an intent to hinder, delay or defraud or warrant the appointment of a § 303(g) trustee.

- "Hellenic has breached significant and material provisions of its contracts with creditors."

> **Response:** Again, Hellenic was generally meeting its obligations prepetition. Its ability to do so has been threatened by the bankruptcy filing. An interim trustee would add administrative expenses to the case without resolving this issue.

*See* Mot. 17–18.

In contrast to preceding allegations, which contain some measure of accuracy—albeit, nothing that supports appointing a trustee—the second category of bullet points are simply erroneous. Those latter bullet points, with Hellenic's responses, are again as follows:

- "All essential employees for business operations (including drivers and office staff) have been terminated by Hellenic."

> **Response:** This allegation is false. Hellenic retains seven employees in California (five drivers and two administrative workers) and six in Florida.

- "It is unknown and uncertain whether Hellenic's trucks and other business assets, including a potential truck stop and fueling location in Fresno, California, have been secured and insured."

> **Response:** Pro Petroleum is attempting to conceal its lack of due diligence by prefacing this allegation with "it is unknown and uncertain" language. Regardless, the allegation is false. Hellenic's assets are insured.

- "The location and condition of Hellenic's assets, including its fuel inventory, trucks, cash, and receivables, is unknown and uncertain."

> **Response:** Pro Petroleum is again attempting to conceal its lack of due diligence by utilizing "unknown and uncertain" language. Mr. Kechagias will be present at trial to testify as to the assets of Hellenic. The fact that Pro Petroleum has not conducted a diligent inquiry into this matter is not grounds for the appointment of a trustee.

- "Hellenic has made misrepresentations to creditors, evidencing an intent to hinder, delay, or defraud them, not only in obtaining their funding or products, but also in forestalling their discovery of Hellenic's fraud and enforcement of their rights and interests."

  **Response:**  This is a bare legal allegation without any factual underpinning. Nonetheless, Hellenic categorically denies this allegation.

- "Hellenic has engaged in fraudulent conduct in the way it obtained fuel, loans and funding."

  **Response:**  Again, this is a bare legal allegation without any factual underpinning.  Hellenic categorically denies this allegation.

- "It is unknown whether Hellenic's fuel supply has or will have possessory liens against it as a result of Hellenic's likely failure to pay storage."

  **Response:**  Hellenic is current on storage costs and is unaware of related possessory liens at this time.

- "Given the creation of Central Coast Petroleum (in the name of Salvador and Olga Estrada, with the business address at their home, and the purchase of a truck), and given Hellenic's eleventh hour 'settlement' with a supplier apparently so that Central Coast Petroleum would have a source of fuel to sell, it is likely and highly probable that there have been preferential and/or fraudulent transfers of assets (and Hellenic's business) to the detriment of Hellenic's creditors."

  **Response:**  As stated supra, Central Coast is a separate entity owned by the Estradas that leases two trailers to Hellenic.  The theory that Hellenic is running a "bust-out" for the benefit of Central Coast has no basis in reality and is denied categorically by Hellenic.

*See id.*

Hellenic has thus refuted each bullet point set forth in the Motion.  Pro Petroleum is seeking the drastic remedy of an interim trustee by asserting a combination of: (1) mundane allegations of financial distress that were, in large part, caused by the bankruptcy filing itself, (2) baseless speculations arising from a lack of due diligence, which are cloaked in "it is unknown whether"

{2387/000/00519459}

language, and (3) frivolous allegations that are denied, such as the "bust-out" theory involving Central Coast.

Pro Petroleum has not come close to meeting its heavy burden under § 303(g).  The Court should deny the Motion.

WHEREFORE, Hellenic respectfully requests that the Court deny the Motion and grant such other relief as it deems appropriate.

## ATTORNEY CERTIFICATION

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing by CM/ECF to all parties registered to receive such service in this case on March 26, 2021.

Respectfully submitted,

**SHRAIBERG, LANDAU & PAGE, P.A.**
Attorneys for Hellenic
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
bss@slp.law
pdorsey@slp.law

By: /s/ Bradley Shraiberg
        Bradley S. Shraiberg, Esq.
        Florida Bar No. 121622
        Patrick Dorsey, Esq.
        Florida Bar No. 0085841

{2387/000/00519459}

# EXHIBIT A

**Transport Topics**

**Catherine Ngai | Bloomberg News**

January 24, 2020 3:00 PM, EST

# Pilot Flying J Changes Corporate Name, Expands Into Energy Market



*(Getty Images)*

*[Stay on top of transportation news: Get TTNews in your inbox.]*

America's largest truck-stop company is rebranding as it grows its market share in both retail fuel and energy divisions.

Pilot Flying J is changing its corporate name and structure to be called Pilot Co. after a two-year push into the energy business, a growth area that has included building out a Houston office, acquiring pipeline and storage assets and buying fuel from across the world.

"We had to change and evolve with the times," Pilot Co. CEO Jimmy Haslam said in an interview. "We got to the point where we started looking around and saying, what could be the next growth vehicle? We didn't want to do something that was totally different. So we took a step back and thought, what could we do to leverage our current platform?"

The solution was an expansion into the energy sector, increasing its so-called vertical integration. Under the leadership of Chief Strategy Officer Shameek Konar — an alum of Castleton Commodities International, Mercuria



In part one of a two-part exploration of autonomous technology today, our latest RoadSigns podcast revisits conversations with CEOs Alex Rodrigues of Embark and Cetin Mericli of Locomation. Hear them explain what testing automated trucks and developing platooning technology

Energy Trading & Marketing Group Inc. — Pilot has shifted from solely focusing on its travel centers and retail fuel sales to also snatching up midstream infrastructure and expanding into water disposal, blending, crude hauling and other business segments.

has taught them about the road ahead — and get new perspective with host commentary. Listen to a snippet from Rodrigues above, and to hear the full episode, go to RoadSigns.TTNews.com.

## Energy Footprint

The moves come after Warren Buffett's Berkshire Hathaway Inc. paid $2.76 billion for a 38.6% stake in the Knoxville, Tenn.-based firm in 2017, with plans to increase that stake to 80% by 2023.

Last year, Forbes ranked Pilot as the No. 10 largest private company in the U.S. It also ranked No. 33 on Transport Topics' 2019 Top 100 Private Carriers list, logging 1,061 tractors, 35 trucks and 1,405 trailers.

The firm, which operates more than 750 travel centers across the U.S. and Canada, already supplies about one-sixth of the nation's diesel consumption. Now, it's focused on widening its footprint. Last year, it acquired NGL Energy Partners LP's TransMontaigne Products Services, giving Pilot an increased presence on the Colonial Pipeline, a vital conduit connecting the Gulf Coast and East Coast. The firm can access 21 terminals along the pipeline, shipping some 80,000 barrels a day.

Pilot also took a majority stake in Pro Petroleum a year prior, giving the company access to the West Coast as well as Arizona, Nevada and West Texas markets. The firm has the third-largest tanker fleet in North America with more than 1,500 trucks able to move energy products including diesel, gasoline, diesel exhaust fluid, biodiesel, crude, water and sand.

For now, the company's expansion plans don't include operating a refinery, but Pilot's evaluating options for protecting its fuel margins, including an equity interest, said Konar.

**Want more news? Listen to today's daily briefing:**



Transport Topics (March 26, 2021)

00:00    02:35

© 2021 Transport Topics All rights reserved. | Privacy Policy

# EXHIBIT B

| Vendor/Creditor | Contact Person | Address | Phone | Nature of Debt | Approx. Amount Owed |
|---|---|---|---|---|---|
| Business Capital Loan | Andrew Spern | 2501 Hollywood Blvd. Suite 210, Hollywood, FL 33020 | 954-364-7792 | Revolving lines | $ 2,148,900.00 |
| Cedar Advance Loan | Simon Cshonbrun | | 718-400-9030 ext 101 | Revolving lines | $ 467,688.00 |
| Affinity Truck | | 2707 S East Avenue | 559-266-9531 | Truck purchases | $ 92,476.76 |
| Seperation by Design | | | | Load Cart | $ 50,778.98 |
| Fairmont Capital | Richy | 333 Pearsall Avenue Suite 207, Cedar, NY 11516 | 310-706-8905 | Revolving lines | $ 2,879,282.00 |
| Fresh Funding | | 42 Broadway Street 1815 New York 10004 | 888-355-4352 | Revolving lines | $ 616,875.00 |
| Global Funding Expert | | 2701 Queen Plaza North, Sute 802 Long Island City, NY 11101 | 1-877-253-7686 | Revolving lines | $ 2,529,450.00 |
| Payroll Liability | | | | Payroll | $360,512.04 |
| Mansfield Oil (Settlement Agreement) | | | | COGS | $ 800,000.00 |
| Sacremento Energy (Settlement Agreement) | | | | COGS | $800,000.00 |
| Elbow River | | | | COGS | $ 1,500,000.00 |
| Petrola Oil | George Michaelos | 7000 West Palmetto Park Rd. | 954-599-3997 | COGS | $ 1,000,000.00 |
| Diesel Direct West | | 3861 Duck Creek Drive. Stockton, CA 95215 | | COGS | $ 15,896,435.58 |
| Indigo Direct West | | P.O. Box 2535 Gainsville, GA 30503 | 678-513-9114 | COGS | $ 247,933.95 |
| Motiva Enterprise | | | | COGS | $ 281,628.62 |
| Renewable Energy Group | | 416 South Bell Avenue, Ames, IA 50010 | 515-239-8000 | COGS | $ 507,207.37 |
| Shell Oil Products (Equilon Enterprises) | | 3515 Navy Drive, Stockton, CA 95203 | | COGS | $614,800.90 |
| Huth Family Partnership | Steve Huth | 326 Prosperity Circle Porterville, CA | 559-783-1207 | Mortgage (March) | $24,488.35 |
| Andreini Insurance | Cindy Tarango | 220 W. 20th Ave, San Mateo, CA 94403 | 805-981-9585 | Insurance | $30,589.04 |
| Aramark | | PO Box 101179 Pasadeno, CA 91189 | 800-504-0328 | Mats and laundry ( Truck Stop) | $615.72 |
| Prime Towing | | 1250 South O St. Tulare, CA 93274 | 559-684-7796 | tow on 2/18/2021 | $925.00 |
| Core-Mark | Vicki Taylor | | 661-201-7020 | products sold in Truck Stop | $4,000.00 |
| Office City | Claudia Parsons (accounting) | 3167 Corporate Place Hayward, CA | 209-444-5442 | Office supplies FL & CA | $3,450.00 |
| Lynco Products | Beth Mosley (accounting) | 1410 11th St. Milan , IL 61264 | 309-283-2197 | Truck parts sold (Truck Stop) | $3,100.00 |
| Select Management Services | Denee Bracey Davis | PO Box 681055 Franklin TN 37068 | 615-790-1627 | | $1,000.00 |
| Malaga County Water District | | 3580 S. Frank Fresno, CA 93725 | 559-485-7353 | water service Truck Stop | $724.15 |
| Tank Specialties | Nacole Venegas | 2695 S, Fourth St. Fresno, CA 93725 | 559-579-1450 | Tank Repairs | $1,474.70 |
| Comcast | | | 855-281-5742 | Phone & Internet (Truck Stop) | $355.00 |
| Merry Maids | Brad | 120 N. Valley Oaks Dr. Suite A Visalia 93292 | 559-734-3320 | Cleaning Service (Pville) | $1,156.00 |
| Stop Alarm | | 65 S. Hockett St. Porterville, CA 93257 | 559-781-3310 | Alarm Service (Pville) | $100.00 |
| J.C. Martin & Son | | 215 Old Line Ct. Exeterm CA 93221 | 559-280-2919 | Truck Repair | $2,500.00 |
| Fresno Truck Center | | 2727 E Central Fresno, CA 93725 | 800-999-9152 | Wrecked Truck Repair | $22,111.56 |
| | | | | | $ 30,890,558.72 |